## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DONNA MORRIS, individually and as** | ) | |
| **Next friend of WILLIAM MORRIS, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-0376-CVE-TLW** |
| | ) | |
| **CITY OF SAPULPA, JAMIE NOE,** | ) | |
| **JAMES PRINE, and MIKE HEATHERLY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court is Defendants City of Sapulpa and Jamie Noe's Motion for Summary

Judgment and Brief in Support (Dkt. # 18). Plaintiff has filed a brief in opposition (Dkt. # 24), and

defendants replied (Dkt. # 35).

## I.

This case arises out of an encounter that occurred on July 5, 2006 between William Morris

III (Morris III) and members of the Sapulpa Police Department. Dkt. # 2, at 2-5. At approximately

9:00 p.m. that evening, Sergeant Jamie Noe of the Sapulpa Police Department was parked in his

patrol car in a parking lot in Sapulpa, Oklahoma. Dkt. # 18, at 4. A passing motorist alerted him

that there was a domestic disturbance taking place at a house nearby. Id. Noe proceeded to the

location identified, 1024 South Muskogee Street, and encountered three individuals in front of the

residence: plaintiff Donna Morris, Misty Rowell, and Quinton Bell. Bell was Rowell's former

boyfriend and the father of her child. Rowell's then-current boyfriend was William Morris IV

(Morris IV), the son of plaintiff and Morris III. When Noe arrived, there was a vehicle parked at

the house with significant body damage, and a pile of clothing smoldering in the front yard.  Dkt. # 24-3, at 9-10.

Noe learned from the three individuals that Morris IV sometimes lived with Rowell and Bell at the Muskogee Street residence.  Dkt. # 18-3, at 4.  On the day of the incident, Morris IV became angry with Rowell and Bell for an unidentified reason.  Dkt. # 18, at 2.  Rowell, Bell, and their child were traveling together in a vehicle when Morris IV, driving in another vehicle, allegedly made an intentionally wide turn and collided with the vehicle in which Rowell and Bell were riding.  Id. After the collision, Morris IV continued driving.  Id.  Rowell said that Bell chased Morris IV for approximately three miles after the collision, and that the two men had gotten into a fight.  Dkt. # 18-3, at 2.  Rowell and Bell took their child to the home of a relative, and then returned to the Muskogee Street residence.  Upon their return, they discovered that Morris IV had set a number of items of Bell's clothing on fire in the front yard and had broken the television and other household items. Id. at 2-4.  Rowell reported that Bell then grabbed a tire iron and began hitting her car (the vehicle that Morris IV had been driving at the time of the collision), and that he broke all of the windows and damaged the metal body parts.  Id. at 4.  At some point, Donna Morris heard from her daughter, Brenda, that Morris IV was hurt, and she went to the Muskogee Street residence to check on him.  Dkt. # 18, at 5.  Although the sequence of events is somewhat unclear, at some point after Donna Morris arrived and parked in the driveway, Bell parked his truck behind Donna Morris's vehicle, preventing her from being able to leave.  Id.  When Noe arrived, Donna Morris, Rowell, and Bell were in the front yard, fighting.  Dkt. # 24-3, at 7-8.  He proceeded to take statements from them, and attempted to defuse the situation.  Id. at 8.  Sapulpa Police Department Officer Mike

Heatherly and Reserve Officer James Prine arrived a few minutes after Noe. Id. at 8-10. Heatherly and Prine assisted in taking statements and calming the individuals in the yard. Id. at 10.

Following the arrival of the officers, Donna Morris called her husband, Morris III; her statements regarding what she told him on the phone vary. See Dkt. # 24-1, at 5 ("told him I was there, the police were there,"); Dkt. # 24-1, at 7 ("I told him that Quinton had asked me where Ray was and I told him I didn't know" . . . "I told him that I couldn't leave"). Approximately ten to twenty minutes after the officers arrived, and while they were still standing in the yard with plaintiff, Rowell, and Bell, Morris III arrived. Dkt. ## 18, at 5-6; 19-1, at 16; 24, at 3-4. At the time of the incident, Morris III was approximately 60 years old. Dkt. # 24-3, at 14. He was six foot four, and weighed approximately 250 pounds. Dkt. # 24-1, at 3. He had previously suffered a heart attack and stroke, seizures, been diagnosed with emphysema, and directed to use supplemental oxygen at all times. Id. at 2-3.

Upon his arrival, Morris III and Donna Morris spoke, and Donna Morris assured him that she was not hurt. Dkt. # 24, at 4. Morris III then allegedly asked Donna Morris "is that him?" in reference to Bell. Dkt. # 18, at 6. When she answered in the affirmative, Morris III began walking toward the group of officers and Bell. Id. Noe says that he allowed Morris III to walk by him because Morris III's intent was not clear. Id.; Dkt. # 19-1, at 18. Noe saw that Morris III did not have a weapon in his hand. Dkt. # 24-3, at 13. Noe claims that Morris III began yelling at Bell once he reached him, and that he pushed him three times. Dkt. # 19-1, at 21. Noe then closed the distance between himself and Morris, grabbed Morris III's left arm, applied pressure, and instructed him to calm down. Dkt. ## 18, at 7; 19-1, at 18, 22. Noe claims that at the same time he grabbed Morris III's left arm, Morris III made a fist and drew his right arm back to assault Bell. Dkt. # 19-1,

at 22.  Noe says he then "took [Morris III] to the ground"[1] and handcuffed him.  Id.  Noe claims that

Morris III's speech was slurred, his behavior was indicative of being under the influence of alcohol,

and that his breath smelled of alcohol.  Id.; Dkt. # 19-1, at 29.[2]  He also claims that Morris III

admitted at the scene that he had been drinking, and that he apologized to Noe for his behavior.  Dkt.

# 19-1, at 29.  Noe consequently issued Morris III a citation for a municipal charge of public

intoxication, Dkt. # 19-2, at 2, but made no additional charges.  Dkt. # 18-3, at 3.

An incident report prepared by Heatherly after the events at issue describes the incident in

the same way as Noe.  Dkt. # 18-3, at 3.  However, the descriptions of the events given by plaintiff

and Morris III deviate from defendants' from the time of Morris III's arrival at the Muskogee Street

residence.  Plaintiff claims that Morris III arrived at the scene approximately twenty minutes after

the officers, and that the situation was at that point under control.  Dkt. # 24, at 5.  She claims that

although Morris III did approach Bell, he was never closer to Bell than eight to ten feet.  Dkt. ## 24,

at 4; 24-1, at 9.  Plaintiff claims that Morris III never made any physical contact with Bell; instead,

she says Bell walked toward Morris III, who then raised his hands defensively and backed up toward

the police.  Id.  She says that Noe actively observed Morris III as he approached, and then tackled

him from behind.  Id. at 5-6.  Similarly, Morris III says that upon his arrival at the house, he asked

---

[1]     When asked, Noe said he was comfortable with the term "took him to the ground" to refer
to the physical force used against Morris III.  Dkt. # 19-1, at 28.  That term also appears in
the police incident reports.  For ease, the Court will also use the term "tackle" to describe
Noe's actions toward Morris III.  However, the use of that term is not intended to convey any
degree of force or injury different than the terminology used by Noe.

[2]     Morris III admits to having "a couple of drinks" two hours before going over to the house.
Dkt. # 24-2, at 10.  Records from Saint Francis Hospital made upon Morris III's admission
on the night of the incident state that his "breath smells of alcohol," Dkt. # 35-2, at 5, and
that he "admits to alcohol use tonight."  Dkt. # 35-4, at 2.

his wife, "is that him [Bell]?," and that he called "hey" to Bell. Dkt. # 24-2, at 3. Morris III says

that Bell then began running at him, causing Morris III to throw up his hands because he didn't

know what Bell, who he identifies as having just gotten out of prison, was going to do. Id. He

claims that "the next thing [he] knew, [he was] eating dirt," and that two[3] Sapulpa policemen

"grabbed [him] from behind and threw [him] into some branches." Id. Morris III alleges that after

he was handcuffed, he couldn't feel his leg and was unable to stand. Id. at 4. He says that the

officers "just cussed [him], cussed the wife," and that when plaintiff attempted to help him, the

officers "told her if she didn't shut up, she'd be the next one in handcuffs." Id.

Noe's tackle caused Morris III to sustain substantial injuries to his hip. He was unable to

stand or walk immediately following the incident. Dkt. # 24-2, at 4. An ambulance was called, and

Morris III was taken to Saint Francis Hospital in Tulsa, Oklahoma. Dkt. # 24-1, at 9. Morris III

stayed at Saint Francis for approximately thirty days. Dkt. # 24-2, at 5. Due to complications from

his hip, he received rehabilitation treatment at a veterans' hospital in Oklahoma City, Oklahoma,

where he learned how to use a walker, which he was forced to rely upon for mobility. Id. at 6. He

stated that, prior to the incident, he worked out every day by walking on a treadmill, lifting weights,

walking the dog, and engaging in other activities. Id. He said that his lifestyle was altered by the

injury to his hip in that he was told to no longer walk on the treadmill, he was unable to attend

family events, and he did not leave the house very frequently out of fear of falling. Id. at 7-9.

Morris III was transferred at some point to The Gardens, a nursing home in Sapulpa, Dkt. # 24-1,

---

[3]     Both plaintiff and Morris III stated at their depositions that Morris III was tackled by two
        Sapulpa police officers. However, the statement of facts in plaintiff's opposition to summary
        judgment names only Noe as the officer making physical contact with Morris III, and the
        pleadings similarly implicate only Noe.

at 9, and also received at-home care from Saint Francis Hospital. Dkt. # 24-2, at 8. Months after the incident at issue, a treating physician noted that he was still in "severe pain." Dkt. # 35-5, at 2.

Because Morris III was in the hospital for several weeks following the incident, he was unable to appear in court on his citation for public intoxication. Dkt. # 24-1, at 9. Morris III states that he told plaintiff to "do what's right" and pay the fine, but denies pleading guilty to public intoxication. Dkt. # 24-2, at 10. Plaintiff states she went to the court to pay the fine for the citation because she "felt it was like a bill." Dkt. # 24-1, at 9. She claims that she told the judge that she came to pay the ticket for her husband, who was in the hospital. Id. Plaintiff does not remember whether she entered a plea of guilty. Id. Judge Stephanie Lorbiecki, the judge in front of whom plaintiff appeared on behalf of her husband, also does not specifically remember the court appearance in question. Dkt. # 35-8, at 2. However, Judge Lorbiecki testified that, if a person appeared before her and informed her that a spouse was unable to appear because he was in the hospital, the case would be continued. Dkt. # 35-8, at 2. She states that if the spouse appeared and wanted to pay the fine for the citation, she would explain that she would record the plea as a guilty plea, and would make sure the spouse understood that fact before proceeding. Id. Sapulpa court records show a guilty plea entered on behalf of William Morris III on July 24, 2006. Dkt. # 19-3, at 3.

On December 21, 2007, Donna Morris and Morris III filed a petition in state court against the City of Sapulpa (the City), the Sapulpa Police Department, and Jamie Noe. Dkt. # 4-3. The court dismissed several defendants, and on August 7, 2009, the remaining defendant, the City, moved to dismiss the action for failure to prosecute. Having evidently received no response from the plaintiffs, the City on September 11, 2009 filed an application to deem confessed its motion to

dismiss. Dkt. # 4-8; Dkt. # 4-9. The motion to deem confessed the motion to dismiss was granted on September 21, 2009, and the case was dismissed that day. Dkt. # 4-10.

Morris III died in 2009. On June 11, 2010, Donna Morris, individually and as next friend of Morris III, filed this action. Dkt. # 2. In her complaint as surviving spouse, she names two defendants from the state suit (Noe and the City), as well as two additional individual defendants (James Prine and Mike Heatherly). Id. The complaint contains the following specific counts by Donna Morris individually and as surviving spouse against all defendants:[4] (1) unnecessary and unreasonable use of excessive force against Morris III in violation of his constitutional rights; (2) unlawful arrest of Morris III; (3) state law claim for intentional infliction of emotional distress as to both plaintiffs; (4) state law claim for false arrest of Morris III; and (5) state law claim for negligent causation of injury to Morris III. Plaintiff also states a state law claim against the City for negligent hiring, training, and supervision of the officer defendants. Id. at 4-5. The Court previously dismissed plaintiff's claims against defendants Prine and Heatherly in their entirety. Dkt. # 11.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates

---

[4]     "A suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same." Watson v. City of Kansas City, 857 F.2d 690, 695 (1988). To the extent that plaintiff asserts claims against Noe in his official capacity, the Court will consider these claims as one with her claims against the City. See id.

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

## III.

The two remaining defendants seek summary judgment on all of plaintiff's claims for relief. Dkt. # 18.

### A.    Section 1983 Claims

Plaintiff states claims of relief for use of excessive force and unlawful arrest of Morris III under 42 U.S.C. § 1983 against both Noe and the City.  Section 1983 provides a cause of action against state actors for violation of a plaintiff's federal rights.  Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007).  To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Anderson v. Suiters, 499 F.3d 1228, 1232-33 (10th Cir. 2007).

### 1.    Use of Excessive Force

Plaintiff alleges that "[d]efendants' actions constitute[d] an unnecessary and unreasonable use of excessive force against Mr. Morris, in violation of Mr. Morris'[s] constitutional rights."  Dkt. # 2, at 4.  Although plaintiff's complaint does not state the particular right upon which her claim is based, it arises under the Fourth Amendment of the United States Constitution.  The Fourth Amendment protects against unreasonable searches and seizures, and "pertains to the events leading up to and including an arrest of a citizen previously at liberty."  Porro v. Barnes, 624 F.3d 1322, 1325 (10th Cir. 2010).  Therefore, "excessive force claims arising during this period are generally reviewed under a relatively exacting 'objective reasonableness' standard."  Id.

"To prevail on a claim for excessive force under the Fourth Amendment, a plaintiff must show he or she was 'seized' by a government actor."  Arnold v. Curtis, 359 F. App'x 43, 47 (10th

Cir. 2009).[5]  "Seizure" means a "governmental termination of freedom of movement <u>through means intentionally applied</u>." <u>Id.</u> (internal quotations omitted)(emphasis in original).  "While the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, that degree is not unlimited." <u>Chidester v. Utah County</u>, 268 F. App'x 718, 726 (10th Cir. 2008)(unpublished).[6]  "The ultimate question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." <u>Cavanaugh v. Woods Cross City</u>, 625 F.3d 661, 664 (10th Cir. 2010).  "To guide this inquiry, the Supreme Court has delineated three, non-exclusive factors: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether he is actively resisting arrest of attempting to evade arrest by flight." <u>Herrera v. Bernalillo Cnty. Bd. of Cnty. Comm'rs</u>, 361 F. App'x 924, 928 (10th Cir. 2010)(unpublished)[7](citing <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).

There is no dispute that Noe's tackle of Morris III constituted a seizure for purposes of the Fourth Amendment.  Thus, the question is whether that seizure was objectively reasonable under the totality of the circumstances.  Defendants assert that "Morris III's aggressive behavior toward Mr. Bell at the scene must be taken into account when analyzing the exigency of the situation." Dkt. # 18, at 12.  They claim that because Morris III initiated physical contact with Bell in an effort to start a fight and did not respond to Sergeant Noe's attempt to use lesser force by placing a hand on

---

[5]    Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

[6]    Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

[7]    Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

his arm, Sergeant Noe was forced to respond a rapidly-evolving situation that was becoming violent. Under those circumstances, they argue, Noe's actions were reasonable under the <u>Graham</u> factors.

However, on a motion for summary judgment, the Court must construe the facts in the light most favorable to the nonmoving party. The versions of the events at issue given by plaintiff and her late husband vary greatly from those related by defendants. Donna Morris testified that the situation when Morris III arrived was calm and under control, that Morris III asked her if she was all right when he got there, and that he then walked toward the group of officers and Bell. Dkt. # 24-1, at 7. She states he never got closer to Bell than eight to ten feet, and that, from that distance, he said only something like "why was you talking to Mama that way?," and that she had been feeding Bell's child. Dkt. # 24-1, at 7. She said that she did not hear a response from Bell, but that Morris III then began backing up toward the officers "for help, I guess. I don't know. He was just backing up towards the police officers like he didn't want to – it was all he had to say." <u>Id.</u> at 8. She says the next thing that happened was that "two[8] of the police officers lunge[d] toward [Morris III] and put their hands on his shoulders[,] twisted him around and ran him into the bushes . . . throwing him to the ground. Then they put their knees – fell into his midsection and his back and handcuffed him." Dkt. # 24-1, at 8. Her testimony is corroborated by that of Morris III, who said that he walked up to the house, asked his wife if it was Bell who had blocked her in the driveway, said "hey" to Bell, and that Bell then began running toward him. Dkt. # 24-2, at 3. He said that when Bell began

---

[8]     <u>See</u> <u>supra</u> n.3.

running at me . . . I just threw my hands up because I didn't know what he was going to do. . . . And then the next thing I know, I'm eating dirt. Sapulpa – two Sapulpa policemen grabbed – I didn't even know they was around. They grabbed me from behind and threw me into some branches. . . . They handcuffed me, picked me up three times by the handcuffs and stood me up and each time they did, I fell.

Id. at 3-4. Based on Donna Morris's testimony, the severity of the situation was minimal, and the testimony of Morris III and Donna Morris provides no basis for a finding that Morris III did or was about to commit or contribute to any crime. Moreover, based on their testimony, Morris III never made physical contact with any person present. Both Morris III and Donna Morris claim that Noe went immediately to "take [Morris III] to the ground," without any intermediate measures taken by the officers.

Noe gave his opinion that if Morris III had not made physical contact with Bell, tackling him would have constituted excessive force. Dkt. # 24-3, at 6. The inquiry into excessive force is an objective one, and Noe's personal assessment of the situation is not controlling. Chidester, 268 F. App'x at 726. However, the Court agrees that, absent aggressive behavior on the part of Morris III, a jury could find that the tackle of Morris III was not reasonable. In Chidester, a number of law enforcement officials were preparing to raid a residence. Id. at 721. Construing the facts in favor of the plaintiff, the court found that the plaintiff, who lived next to the object of the raid, had walked outside to investigate noise from the defendants' operation. Id. at 722-23. As the plaintiff turned to go back inside his home, one of the officers began running toward him, pointing an automatic weapon. The officer yelled at the plaintiff to put his hands in the air and to get on the ground. The plaintiff found it difficult to comply with both directives, but yelled repeatedly "I'm not resisting, I'm not resisting," with his hands in the air. Id. at 723. The officer continued running at the plaintiff, and then tackled him to the ground. Id. The Tenth Circuit recognized that the officer was

in a high-stress situation, presented with an unknown person, and had to make a split-second decision about how to proceed. Id. at 727. However, the court balanced that need on the part of the officer with the fact that the police were aware of the plaintiff's residence prior to the raid, that the plaintiff did not resist arrest or attempt to flee, and that he put his hands in the air when directed. Id. "Although the situation was threatening, [the officer] was armed with an automatic weapon and, according to [the plaintiff's] version of the facts, faced with a compliant suspect whose hands were above his head. Under these facts, engaging [the plaintiff] in such a physical manner was not reasonable." Id.

Like the court in Chidester, the Court appreciates the need for officers to react quickly and respond as they think appropriate to constantly-moving situations. By all accounts, although the situation had calmed, emotions had been previously running high among the persons gathered at the Muskogee Street residence, a great deal of property damage had been caused, and Noe may have had reason to fear that the situation could be easily reignited. However, under Donna Morris and Morris III's version of the facts, during a situation that had already been defused by the police, a 60-year-old, physically weak man began backing toward the group of officers with his hands in the air, trying to avoid perceived aggression on the part of Bell. Dkt. ## 24-1, at 8; 24-2, at 3-4. Under this version, no crime was taking place. Moreover, there were three officers present – nearly one officer for every unarmed individual – and Morris III was not threatening the safety of any of the officers. Further, there is no basis for a finding that Morris III was resisting arrest because under their version of the facts, Noe never made verbal or physical contact prior to tackling Morris III. Construing the facts in the light most favorable to plaintiff, a reasonable jury could find that "engaging [Morris III] in such a physical manner was not reasonable." Chidester, 268 F. App'x at 727. Genuine issues of

material fact exist as to the encounter between Noe and Morris III, and those facts will necessarily impact a finding as to the reasonableness of Noe's behavior. Summary judgment as to plaintiff's excessive force claim is therefore denied.

## 2.    Unlawful Arrest

Plaintiff also claims that defendants' actions "constitute an unlawful arrest of Mr. Morris, without any probable cause or proper justification." Dkt. # 2, at 4. "Generally, a warrantless arrest is constitutionally valid when an officer has probable cause to believe that the arrestee committed a crime." Stearns v. Clarkson, 615 F.3d 1278, 1282 (10th Cir. 2010).

Noe claims that he had probable cause to arrest Morris III based on the attempted assault of Bell and Morris III's threats to Bell. Dkt. ## 24-3, at 18; 35, at 9. Defendants argue that Morris III's statements following the incident, as recorded in medical records, that "he was attempting to get into a fight," Dkt. # 35, at 2, that he had gone to the house "to protect his wife and got in a fight with a gentleman," id., and that he swung at Bell to hit him and stop his attack, id. at 3, show that probable cause existed. Id. at 9. However, such statements by Morris III do not eliminate the fact issues discussed above as to what transpired upon Morris III's approach of Bell.[9]

"Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." United States v. Martin, 613 F.3d 1295, 1302 (10th Cir. 2010). The probable cause inquiry is an objective one, and "[a]n arrest is not invalid under the Fourth Amendment simply because the police officer

---

[9]    These records may be highly persuasive evidence that plaintiff engaged or attempted to engage in an assault of Bell. However, although it is a close question, they do not "blatantly contradict" plaintiff's version of the facts to the extent that a reasonable jury could not find that probable cause was not present. York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th Cir. 2008).

subjectively intended to base the arrest on an offense for which probable cause is lacking, so long the circumstances, viewed objectively, justify the arrest." Howards v. McLaughlin, 634 F.3d 1131, 1141 (10th Cir. 2011). Defendants set forth a variety of laws for which probable cause would have existed for an arrest. Under Oklahoma law, "[a]n assault is any willful and unlawful attempt or offer with force or violence to do a corporal hurt to another." OKLA. STAT. tit. 21, § 641. The municipal offense of disturbing the peace in Sapulpa is committed by the use of "obscene, abusive, profane, vulgar, threatening, violent or insulting language or conduct," "appearing in an intoxicated condition," "engaging in a fistic encounter," and other behaviors. Dkt. # 35-10, at 3-4. The Sapulpa municipal offense of disorderly conduct involves violent action toward another that results in a person being placed in fear of his own safety, jostling or pushing another in a public place, using "fighting words" and creating a tumult, or causing, provoking, or engaging in any fight, brawl, or riotous conduct, among other conduct. Dkt. # 35-10, at 4-5. Public intoxication is defined as being in a public place under the influence of alcohol to such an extent "as to deprive the person of his full mental or physical power or be unable to exercise care for his own safety or the safety of others." Dkt. # 35-10, at 6. Resisting an officer and failure to obey orders from an officer are also municipal offenses in Sapulpa. Dkt. # 35-10, at 7.

The question on summary judgment as to whether Noe had probable cause to arrest Morris III is very close. However, construing the facts in the light most favorable to plaintiff, Morris III did not arrive at the scene displaying signs of intoxication, and did not engage in any violent or provocative behavior. Instead, he simply walked up to where Bell and the officers were standing, said "hey" to Bell, and then backed away as Bell became aggressive. Even taking those facts as true, there is a strong argument that Noe had probable cause to arrest Morris III for one of the municipal

offenses outlined above.  However, a jury's finding of wholly nonaggressive, nonviolent behavior

of Morris III would eliminate probable cause to arrest him.   Therefore, there is a genuine issue of

material fact as to whether behavior of Morris III would have justified a belief by Noe that probable

cause existed, and summary judgment is therefore inappropriate as to this claim as well.

### 3.  Municipal liability

The City claims that it is not liable for plaintiff's § 1983 claims because she  has not made

the requisite showing for municipal liability.  In a § 1983 claim against a municipal entity, the

"under color of state law" element is satisfied only where the constitutional deprivation occurred

pursuant to official policy or custom.  See Monell v Dep't of Soc. Servs. of City of New York, 436

U.S. 658, 694 (1978).  Thus, "to establish municipal liability, a plaintiff must show (1) the existence

of a municipal policy or custom, and (2) that there is a direct causal link between the policy or

custom and the injury alleged."  Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010).

A policy or custom may take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a
> widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or usage
> with the force of law; (3) the decisions of employees with final policymaking
> authority; (4) the ratification by such final policymakers of the decisions – and the
> basis for them – of subordinates to whom authority was delegated subject to these
> policymakers' review and approval; or (5) the failure to adequately train or supervise
> employees, so long as that failure results from deliberate indifference to the injuries
> that may be caused.

Id.  Plaintiff claims that "[a]lthough Defendant City of Sapulpa has written policies regarding the

use of force by police officers, the true custom and policy of the Sapulpa Police Department is to

condone excessive uses of force which are outside the written policy."  Dkt. # 2, at 4.  She has not

proffered the City's written policies, but rather relies for her claim solely on testimony by Noe that

he received substantial training, and that, in his view, his actions were taken in accordance with City of Sapulpa Police Department policy. Dkt. # 24-3, at 20. Plaintiff claims that because "if given the chance to act again under the same circumstances, Noe would not act differently" and because Noe was not investigated or disciplined for his actions in this case, there exists a policy in support of his behavior. Thus, she argues that "[r]egardless of what any written policy manuals say, abuse like that suffered by Mr. Morris is the officially endorsed custom of the Sapulpa Police Department." Dkt. # 24, at 14.

Plaintiff's argument is essentially that the Sapulpa Police Department would have ratified Noe's behavior and, therefore, that a policy or custom exists that resulted in the constitutional violation to her husband. However, Noe's testimony was that the use-of-force policy on which he was trained required force to be "reasonable and necessary." Dkt. # 24-4, at 5. Reasonableness is the constitutional standard for use of force, and Noe's testimony undercuts plaintiff's claim that a City policy was in place to which any violation of Morris III's constitutional rights may be attributed. The burden therefore shifts to plaintiff to "set forth specific facts" sufficient to raise a genuine issue for trial. Green v. Busha, 59 F.3d 178, (10th Cir. 1995)(unpublished)[10](citing John Hancock Mut. Life Ins. Co. v. Weisman, 27 F.3d 500, 503 (10th Cir. 1994)). Apart from her statements that Noe thought he was following City policy, plaintiff has pointed to no specific facts regarding a policy or custom that would have led to Noe's use of excessive force, nor has she shown facts sufficient to support a finding of "deliberate indifference" on the part of the City in its failure to provide training. She has also failed to allege that any City policy caused her husband's wrongful

---

[10]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

arrest. Therefore, there is no genuine issue of material fact as to a municipal policy or custom that would create municipal liability for plaintiff's § 1983 claims. Therefore, the City is entitled to summary judgment on plaintiff's § 1983 claims.

### 4. Qualified immunity

Noe claims entitlement to qualified immunity. Qualified immunity protects government officials sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Clark v. Wilson, 625 F.3d 686, 690 (10th Cir. 2010); Tri-State Contractors, Inc. v. Fagnant, 393 F. App'x 580, 583 (10th Cir. 2010)(unpublished).[11] "The entitlement to qualified immunity is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to got to trial." Pueblo Neighborhood Health Cents., Inc. v. Losavio, 847 F.2d 642, 644 (10th Cir. 1988). "An assertion of qualified immunity at summary judgment shifts the burden to the plaintiff to show: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." Frazier v. Ortiz, No. 10-1133, 2011 WL 1110648, at * 4 (10th Cir. 2011). "Thus, in order to overcome a motion for summary judgment, a plaintiff must first show that, taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Zia Trust Co. ex rel. Causey v. Montoya, 497 F.3d 1150, 1154 (10th Cir. 2010)(internal quotations omitted).

---

[11]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

As discussed above, the facts construed in the light most favorable to plaintiff could support a finding that Noe's conduct violated Morris III's constitutional rights against use of excessive force. Thus, whether Noe enjoys qualified immunity on plaintiff's excessive force claim depends on whether the law surrounding that right was clearly established

As the Tenth Circuit has explained,

The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be "clearly established." Since 1989, Supreme Court precedent has unambiguously held that excessive force claims are regulated by the Fourth Amendment, and that uses of force that are not objectively reasonable are unconstitutional. In 1992, we held that <u>Graham</u> itself was enough to constitute clearly established law in an excessive force case. More recently, however, the Supreme Court has held that <u>Graham</u>'s "general proposition . . . is not enough" to turn <u>all</u> uses of excessive force into violations of clearly established law. In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear <u>which</u> uses of force are unreasonable.

<u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)(internal citations omitted)(emphasis in original). Ordinarily, for a rule to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains." <u>V-1 Oil Co. v. Means</u>, 94 F.3d 1420, 1423 (10th Cir. 1996). In other words, "[t]he dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Cavanaugh</u>, 625 F.3d at 666. "However, because excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be a previously published opinion involving exactly the same circumstances." <u>Casey</u>, 509 F.3d at 1284. The Tenth Circuit has

[t]herefore adopted a sliding scale to determine when law is clearly established. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.

Thus, when an officer's violation of the Fourth Amendment is particularly clear from Graham itself, [courts] do not require a second decision with greater specificity to clearly establish the law.

Id. In Chidester, the court found the conduct on the part of the officer to be objectively unreasonable. 268 F. App'x at 727. However, the court then went on to consider the officer's claim of qualified immunity. The Chidester court noted that it was clearly established that law enforcement officers may not point weapons at suspects that pose no threat, and that a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee. Id. at 728-29. However, it distinguished the situation in Chidester, where an officer participating in a nighttime raid encountered an unknown man in a place where weapons were expected to be found, where the man did not comply with the officer's directive to place his hands on his head and get on the ground, and where the man's sudden appearance occurred during "a rapidly evolving situation where [the officer] had little time to ascertain [the man's] identity and whether he was a threat." Id. at 729. Because it found that the unreasonableness of the officer's conduct in a situation of such extreme exigency was not clearly established at the time of the events in question, the officer was entitled to qualified immunity. Id. at 729-30.

Although the behavior at the heart of the alleged constitutional violations in this case is similar to that in Chidester, the law applicable to the respective officers' conduct is distinguishable. The court in Chidester found a situation governed by unsettled law where officers were faced with a rapidly-changing situation in which they expected to encounter danger from persons they encountered. Here, construing the facts in the light most favorable to plaintiff, Noe's use of force occurred during a calm situation where all persons and factors were known to the multiple officers

present.  "Graham establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest."  Casey, 509 F.3d at 1278; see also Raiche v. Pietroski, 623 F.3d 30 (1st Cir. 2010)(a "reasonable officer . . . would not have needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped . . . and who presents no indications of dangerousness . . . ."); Gouskos v. Griffith, 122 F. App'x 965 (10th Cir. 2005).  Gouskos, a Tenth Circuit case that had been decided at the time of the events at issue, held that the that tackle of an individual who had arrived on the scene where police were trying to control a party was excessive force where the scene was under control, there was no evidence of violence on the part of the individual, and the individual was trying to leave the scene.  122 F. App'x at * 9-11.

Construing the facts in the light most favorable to plaintiff, the situation at the house was calm and controlled at the time of Morris III's arrival, there was no reason for any officer to believe that Morris III posed a threat to anyone present, and Morris III had not ignored or even been given any other directives by the officers.  Morris III's behavior under this version of the facts raises none of the concerns addressed by the Graham factors, providing a strong suggestion that Noe's conduct was clearly unreasonable under the sliding scale for qualified immunity determinations outlined in Casey.  Gouskos provides additional law, decided prior to the events at issue, that would have provided notice to a reasonable officer that, under plaintiff's version of the facts, tackling Morris III constituted excessive force.[12]  Therefore, Noe is not entitled to qualified immunity with regard to plaintiff's excessive force claim.

―――――――――――――――

[12]    Moreover, although the inquiry is an objective one and his testimony is therefore not dispositive, Noe testified that he believed the force he used would have been excessive had Morris III not been assaulting Bell at the time Noe "took him to the ground."

Nor is he entitled to qualified immunity on plaintiff's unlawful arrest claim. As noted, construing the facts in the light most favorable to plaintiff, Noe lacked probable cause to arrest Morris III. And under Tenth Circuit case law, "it is clearly established that an officer may not arrest an individual without a warrant unless there is probable cause." Stearns, 615 F.3d 1278, 1282 (10th Cir. 2010). Therefore, Noe's claims of qualified immunity must fail.

### B. State Law Claims

Plaintiff also states claims for relief under state law against the City and Noe for intentional infliction of emotional distress on Donna Morris and Morris III, false arrest of Morris III, and negligent infliction of injury to Morris III, as well as a claim against the City for negligent hiring, training, and supervision. Defendants argue that they are entitled to summary judgment on plaintiff's state law tort claims pursuant to the Oklahoma Governmental Tort Claims Act (GTCA). Under that act, "[t]he state or a political subdivision shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment . . . ." OKLA. STAT. tit. 51, § 153(A). The GTCA is the only means of recovery against a municipal entity in Oklahoma, and liability under the statute is "exclusive and in place of all other liability of the state, a political subdivision or employee at common law or otherwise." OKLA. STAT. tit. 51, § 153(B). The GTCA defines a "tort" as a legal wrong involving a violation of a duty imposed by general law or otherwise resulting in a loss as the proximate result of an act or omission of a political subdivision or employee acting within the scope of employment. Tuffy's, Inc. v. Okla. City, 212 P.3d 1158, 1163 (Okla. 2009). "Scope of employment" is defined as performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority. Id. Except in cases where only one reasonable conclusion can be drawn, the question of whether

an employee has acted within the scope of employment at any given time is a question for the trier of fact.  Id.  An employee of a political subdivision is relieved from private liability for tortious conduct committed within the scope of employment.  A political subdivision is relieved from liability for tortious conduct committed by employees outside the scope of employment.  Id.

"Oklahoma law recognizes the applicability of the doctrine of respondeat superior to the Governmental Tort Claims Act.  Under the theory of respondeat superior, one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business."  DeCorte v. Robinson, 969 P.2d 358, 362 (Okla. 1998).  The City admits that Noe, an on-duty officer, was acting within the scope of his employment.  Although plaintiff does not expressly agree that Noe was acting within the scope of his employment, she argues that the City is liable under the GTCA for Noe's actions, and raises no issue as to the inapplicability of the GTCA based on Noe acting outside the scope of his employment.  To show that Noe was acting outside the scope of his employment and impose liability on him instead of the City, plaintiff would have to show that his acts were "so extreme as to constitute a clearly unlawful usurpation of authority [that he did] not rightfully possess."  Id.  The scope of employment includes an officer's misconduct, that, "though illegal, clearly was accomplished through a[n] abuse of power lawfully vested in the officer, not an unlawful usurpation of power the officer did not rightfully possess."  Id. (citing McGhee v. Volusia Cnty., 679 So.2d 729, 732-33 (Fla. 1996)).   Plaintiff does not allege that Noe acted beyond the scope of his duties; she simply alleges that he performed them in an unlawful manner.  Thus, the only reasonable conclusion to be drawn is that Noe was acting within the scope of his employment for purposes of the GTCA.

Under the GTCA, notice of claims must be given to the state or political subdivision, and "[n]o action for any cause . . . shall be maintained unless valid notice has been given and the action is commenced within one hundred eighty (180) days after denial of the claim as set forth in this section." OKLA. STAT. tit. 51, §§ 155, 157. Compliance with the GTCA is a jurisdictional prerequisite to a civil action under the statute, and such compliance must therefore be specifically alleged in a plaintiff's complaint. Ford v. Justice Alma Wilson Seeworth Acad., No. CIV-08-1015-D, 2010 WL 545872, at * 3 (W.D. Okla. Feb. 9, 2010). Failure to allege compliance with the notice requirements mandates dismissal of the claims without prejudice to amendment. Id. Plaintiff's complaint in this action does not address compliance with the GTCA notice requirements. However, in the petition filed in the prior state court action, plaintiff and her husband stated that they brought the action "pursuant to Title 51 § 151 et. seq. of the statutes of the State of Oklahoma, and have satisfied all conditions precedent to the filing of this action." Dkt. # 4-2, at 1. Defendants have not challenged the adequacy of plaintiff's compliance with the GTCA. Neither state nor federal courts have interpreted the requirements of the GTCA where a plaintiff properly alleges compliance with the statute's notice provisions in a state court petition, but fails to do so in a subsequent federal complaint. However, because plaintiff initially complied with the requirements for waiver of sovereign immunity, and defendants have not raised noncompliance as an issue, the Court does not find dismissal of plaintiff's state law claims on those grounds to be warranted.

### 1. Intentional Infliction of Emotional Distress

Plaintiff alleges that defendants' conduct supports a claim by herself and Morris III for intentional infliction of emotional distress. Oklahoma courts have recognized such a cause of action, also known as the tort of outrage. See Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 149 (Okla.

1998). A claim that an officer's conduct is extreme and outrageous removes the conduct from the officer's scope of employment and prohibits recovery against the municipality for such a claim. Tuffy's, Inc., 212 P.3d at 1161-62 n.4. Thus, plaintiff's claims for intentional infliction of emotional distress may be considered against only Noe.

The action is governed by the restricted standards set forth in the Restatement (Second) of Torts, § 46 (1965). Id. In Breeden v. League Services Corporation, 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extent to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376. To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Okla. City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publ'ns, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)). The trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law). If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to a jury to determine whether the defendant's conduct could result in liability. Id.

The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

Regarding Donna Morris, "Oklahoma has never recognized an action for mental suffering [solely] caused by witnessing an injury to another."  Kraszewski v. Baptist Med. Cent. of Okla., Inc., 916 P.2d 241, 245 (Okla. 1996).  Instead, for recovery, a plaintiff must have been "subjected to the same fear and danger which causes injury to the other party;" in those situations, the plaintiff is considered a "participant and a victim, not a bystander."  Id. at 247.  Thus, "recovery is allowed if . . . : 1) the plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from actually viewing the injury to another rather than from learning of the accident later; and 3) a familial or other close personal relationship existed between the plaintiff and the party whose injury gave rise to the plaintiff's mental anguish."  Id. at 248.  Even assuming that plaintiff could satisfy the second and third elements, she has failed to submit any evidence that she was subjected to the same physical violence by Sapulpa police officers that resulted in injury to Morris III.[13] Therefore, there is no genuine issue of material fact regarding this claim, and Noe is entitled to judgment as a matter of law.

Summary judgment is also appropriate as to the claim on behalf of Morris III.  It is uncontested that Noe's actions were intentional.  Thus, the Court must first perform its gatekeeper function with regard to whether Noe's behavior was sufficiently extreme and outrageous, and whether Morris III suffered extreme emotional distress.  Assuming without deciding that a reasonable jury could find Noe's conduct "extreme and outrageous," the Court must determine

---

[13]     She alleges that the officers manifested malice toward her "through verbal abuse and threats of violence."  Dkt. # 2, at 4.

whether there exists a genuine issue of material fact as to whether "the emotional distress suffered . . . was so severe that no reasonable person could be expected to endure it." Computer Publ'ns, Inc. v. Welton, 49 P.3d 732, 736 (Okla. 2002). "While emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea, it is only where the emotional distress is extreme that liability arises." Id. "The intensity and duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed . . . ." Id.

Plaintiff's complaint states that she suffered extreme emotional distress, but makes no similar allegations regarding Morris III. Dkt. # 2, at 4. Morris III's deposition testimony does not contain any evidence of severe emotional distress. Combing the summary judgment record, the only evidence that could be construed as supporting a claim of severe emotional distress on the part of Morris III is a "mental health note" regarding his treatment. Dkt. # 35-5, at 2 ("Today pt [Morris III] notes that he needs something for 'my nerves.' We discussed increasing his Prozac . . . and I informed [him] that I would talk with [another doctor] about Rx . . . to help with his anxiety and agitation . . . . [patient] is quite anxious, mildly agitated, depressed, apprehensive."). Evidence that an individual sought treatment for mental health reasons may support a finding of severe emotional distress, but is not dispositive. Cf. Metro-North Commuter Ry. Co. v. Buckley, 521 U.S. 424, 445 (1997)(Ginsburg, J., concurring in the judgment in part and dissenting in part). However, even where treatment is sought, evidence that an individual is nervous, anxious, nauseated, and unrestful is alone legally insufficient to support a finding of severe emotional distress under Oklahoma law. Zeran v. Diamond Broad., Inc., 203 F.3d 714, 721 (10th Cir. 2000); Daemi v. Church's Fried

Chicken, Inc., 931 F.2d 1379, 1389 (10th Cir. 1991).  Here, the mental health note regarding Morris III's state of mind is insufficient to show distress that "no reasonable person could be expected to endure."  Because there is no other evidence of severe emotional distress of Morris III, there is no genuine issue of material fact, and plaintiff's claim must fail.

### 2.  False Arrest

Plaintiff also alleges claims against both the City and Noe for false arrest.  Under the GTCA, a municipal entity is liable for an arrest made without probable cause where taken in the scope of an officer's employment.  Overall v. State ex rel. Dep't of Pub. Safety, 910 P.2d 1087, 1091-93 (Okla. Civ. App. 1995).  As noted, there is no question that Noe was acting within the scope of his employment, and the City therefore has exclusive liability for plaintiff's claim.  Under Oklahoma law, a claim of false arrest requires a plaintiff to "prove the lack of probable cause for the institution of a criminal action against the plaintiff."  In re De-Annexation of Certain Real Property From City of Seminole, 143 P.3d 228, 232 (Okla. Civ. App. 2006).  For the reasons stated above, summary judgment on this claim is improper because genuine issues of material fact remain as to whether Noe had sufficient probable cause to arrest Morris III.

### 3.  Negligent hiring, training, and supervision

Plaintiff also states a claim against the City for negligent hiring, training, and supervision.  In Oklahoma, "[e]mployers may be held liable for negligence in hiring, supervising or retaining an employee."  N.H. v. Presbyterian Church (U.S.A.), 998 P.2d 592, 600 (Okla. 1999).  "In such instances, recovery is sought for the employer's negligence" rather than the acts of an employee.  Id.  However, this theory of recovery is available only where vicarious liability is not established.  Id.  Because the City stipulates that Noe was acting within the scope of his employment, and that

vicarious liability pursuant to the respondeat superior doctrine is therefore applicable, the cause of action for negligent hiring, training, and supervision is not available. See Jordan v. Cates, 935 P.2d 289, 292 (Okla. 1997); see also Landreville v. Joe Brown Co., Inc., 2009 WL 1437801, at * 2 (E.D. Okla. May 21, 2009)("The law appears clearly established in Oklahoma that once an employer . . . has admitted vicarious liability for its employee's actions, no further theory of negligence associated with the particular incident may be maintained against the employer."). Therefore, plaintiff has no cause of action, and summary judgment is appropriate.

### 4. Negligent causation of injury

Finally, plaintiff asserts a claim for negligent causation of injury by Noe against Noe and the City. Again, because Noe was acting within the scope of his employment, this tort claim falls within the City's exclusive liability under the GTCA. "The threshold question in any negligence action is whether the defendant owed a duty of care to the plaintiff." See Morales v. City of Okla. City ex rel. Okla. City Police Dep't, 230 P.3d 869, 878 (Okla. 2010). If such a duty of care exists, was breached, and that breach resulted in an injury to the plaintiff, the defendant is liable for negligent causation of injury. Taylor v. Glenn, 231 P.3d 765, 766 (Okla. Civ. App. 2010). Where the City does not dispute its duty of care to citizens subject to arrest, the Oklahoma Supreme Court has assumed, without deciding, "that a police officer owes a negligence-based duty of care to an arrestee to protect the arrestee from injury." Morales, 203 P.3d at 878. Here, defendants do not dispute that they owed a duty of care, and the Court will adopt the Morales court's assumption. In Morales, the court noted that the standard of care imposed upon a police officer in the performance of his arrest functions is less than that of an ordinary citizen. It concluded that "a police officer's duty is very specific: it is to use only such force in making an arrest as a reasonably prudent police

officer would use in light of the objective circumstances confronting the officer at the time of the arrest. . . . [t]he question is whether the objective facts support the degree of force employed." Id. at 880. The Morales court commented that

> [t]he objective reasonableness test to assess adherence to the standard of care set out in today's pronouncement is like that employed by the United States Supreme Court in § 1983 civil rights claims of excessive force, but the ultimate inquiries differ. In a constitutional tort, the objective reasonableness inquiry is designed to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Striking a balance between an individual's constitutional rights and countervailing governmental interests is not a consideration in a negligence action where the question is simply whether the applicable standard of care has been met or not.

Id. at 880 n.47 (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)). The Morales court went on to cite the three Graham factors as considerations in evaluating the objective reasonableness of an officer's use of force in making an arrest, and listed four other factors as well: 1) the known character of the arrestee; 2) the existence of alternative methods of accomplishing the arrest; 3) the physical size, strength and weaponry of the officers compared to those of the suspect; and 4) the exigency of the moment. Id. at 880. As noted above, construing the facts in the light most favorable to plaintiff, there is a genuine issue of material fact as to whether Noe's conduct was objectively reasonable under the Graham factors. The factors added to the inquiry by the Morales court do not change the Court's conclusion that if the facts are found to be as represented by plaintiff and Morris III, a reasonable jury could conclude that Noe's use of force was excessive, and that he therefore violated his duty of care to Morris III. Because that violation resulted in injury, summary judgment as to plaintiff's claim for negligent infliction of injury is inappropriate.

**IT IS THEREFORE ORDERED** that Defendants City of Sapulpa and Jamie Noe's Motion for Summary Judgment and Brief in Support (Dkt. # 18) is **granted** in part and **denied** in part: it is granted as to the § 1983 claims against the City, the claims for intentional infliction of emotional distress to both plaintiff and her husband against the City and Noe, the claim for negligent hiring, training, and supervision against the City, and the claims against Noe for false arrest and negligent infliction of harm; it is denied as to the § 1983 claims against Noe and the claims against the City for false arrest and negligent infliction of injury.

**DATED** this 28th day of April, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT